Brian K. Jackson (15296)
Brian K. Jackson, LLC
503 W. 2600 S. Suite 200
Bountiful, Utah 84010
Phone: (801) 441-8922
brianj@bjacksonlaw.com
Attorney for Jeffrey Dewsnup

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DIVISION**

| | |
|---|---|
| Jeffrey Dewsnup;<br>Plaintiff,<br>v.<br><br>Utah Soccer Stadium Owner, LLC DBA Real Salt Lake;<br>Major League Soccer, L.L.C;<br>United States Soccer Federation, Inc;<br>Ignacio Hernandez;<br>Aaron Herrera;<br>David Ochoa;<br>Tate Schmitt;<br>Justin Glad;<br>Defendants. | **PLAINTIFF'S OPPOSITION UNITED STATE'S SOCCER FEDERATION'S MOTION TO DISMISS**<br><br>**Case No.** 2:26-cv-00577-RJS-DAO<br><br>**The Honorable Robert J. Shelby** |

Plaintiff, Jeffrey Dewsnup, through counsel, before the honorable Honorable Robert J. Shelby now files this opposition to Defendant's 12(b)(6) motion to dismiss and respectfully request this court to deny Defendant's motion based on the following:

## INTRODUCTION

USSF claims this court does not have personal jurisdiction over it. This is incorrect. USSF required Mr. Dewsnup to register as a member of USSF as a condition to being part of a professional player in his contract with MLS. MLS is a member and on the governing council with the USSF. Its other professional players would be members of USSF as well. Mr. Dewsnup had a direct contractual relationship with USSF to play on its national team in his contract with MLS. USSF also took on the role in ensuring there was no child abuse who were professional

players among its member organizations. This in addition to USSF's requirements to train coaches, professional players and entities, including RSL on child abuse prevention and implement policies regarding professional minor adult players. It would expect and personally availed itself into the state of Utah among its contacts with professional organizations, its contracts with professional organizations and its contract with Mr. Dewsnup to the jurisdiction of the state of Utah and would expect a claim of its failure to protect a professional player would arise in this circumstance.

USSF claims it owed no duty to Mr. Dewsnup as a minor professional soccer player. USSF was in privity of contract with Mr. Dewsnup's MLS contract where they could call him up to the national team at anytime in which it did. It notes Mr. Dewsnup was required to register as a Member of USSF in his contract before he could join as a professional player and would include other professional players as well. The complaint notes that MLS was a member of USSF and part of its governing council. Mr. Dewsnup also notes the duties USSF owed as the national governing body toward minor professional athletes and child abuse and the history behind national governing bodies and child abuse. He also notes the undertaking USSF took on in protecting professional athletes from child abuse and the special relationship Mr. Dewsnup had as a minor child and USSF's duties in policing, training and enforcing child abuse among its professional organizations. The claim that USSF owed no duty to Mr. Dewsnup is unfounded.

**LEGAL ARGUMENT**

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, it only needs to show "plausibility." *ibid.,* … "Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need

at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "show that the pleader is entitled to relief." [1]

As a procedural matter, courts are "reluctant to dismiss complaints based on affirmative defenses at the pleading stage and before any discovery has been conducted." Generally, a court may grant a motion to dismiss on the basis of an affirmative defense "if the facts conclusively establish the defense as a matter of law." A motion to dismiss will be granted only if "the face of the complaint demonstrates that relief is barred by an affirmative defense" and "the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief."

## I. Personal jurisdiction over USSF is appropriate as USSF was in privity of contract with Mr. Dewsnup and purposefully availed itself to the jurisdiction of Utah.

USSF attempts to couch it arguments as if it was a non-active entity involved with Mr. Dewsnup. This is incorrect. USSF was actually directly in privity of contract with Mr. Dewsnup as a professional player as identified in this brief below.

### A. Burger King shows that contractual connection between Mr. Dewsnup, USSF and other professional players and RSL was a substantial connection.

Utah's nonresident jurisdiction act notes that Utah has jurisdiction over non-residents with any claim arising form or relating to the transaction of any business within the state, the causing of injury within the state. Utah Code Section 73B-3-205.

The U.S. Supreme Court in *Burger King* dealt with a situation of an out of state forum where a defendant claimed it had not consented to suit that forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 (1985).

The U.S. Supreme Court has noted that jurisdiction is proper, where the contacts proximately result from actions by the defendant himself that create a "substantial connection"

[1] *Bell Atlantic Corp. v. Twombly* 550 U.S. 544 (2007).

within the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). This is to avoid, "random" "fortuitous" or "attenuated" "contacts." Id.

> The defendant, we have said, must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958). The contacts must be the defendant's own choice and not "random, isolated, or fortuitous." *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984). They must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden* v. *Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted).

*Ford Motor Co. v. Montana Eighth Judicial District Court,* 592 U.S. 351, 354 (2021). **"**Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and, because his activities are shielded by "the benefits and protections" of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well. *Burger King Corp,* 471 U.S. 462, 476.

The Supreme Court has made clear that the relationship between the defendant's contacts and the plaintiff's claims need not satisfy a strict causation requirement. A defendant's forum contacts may support specific jurisdiction where the claims "arise out of or relate to" those contacts. *Ford Motor Co*, 592 U.S. 351, 362–363. As the Supreme Court explained, the phrase "relate to" incorporates a broader relationship between the defendant's forum activities and the litigation and does not require a strict causal connection in every case. *Id.*

The court in *Burger King* noted, "And with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing

relationships and obligations with citizens of another states are subject to regulation and sanctions in the other State for the consequences of their activities." Id. at *Burger King Corp,* 471 U.S. 462, 473.

The Supreme Court has made clear that the relationship between the defendant's contacts and the plaintiff's claims need not always satisfy a strict causation requirement. A defendant's forum contacts may support specific jurisdiction where the claims "arise out of or relate to" those contacts. *Ford Motor Co*, 592 U.S. 351, 362, 363. As the Supreme Court explained, the phrase "relate to" incorporates a broader relationship between the defendant's forum activities and the litigation and does not require a strict causal connection in every case. *Id.*

The case of *Burger King* dealt with a franchise agreement between a Michigan franchisee and the Burger King franchisor in Florida. *Burger King Corp,* 471 U.S. 462, 476. Burger King sued in Florida and the franchisee claimed Florida had no jurisdiction over him. Id. The U.S. Supreme Court noted that the franchisee reached out "beyond" Michigan and negotiated with a Florida company with a 20-year relationship. The court noted that the "quality and nature" of the relationship could in no sense be "random" "fortuitous" or "attenuated." Id. at 475, 476.

Just like the franchisee's failure to make contractually required payments and continued use of trademarks caused foreseeable injuries, USSF failure to make Mr. Dewsnup who was a professional soccer player, and its legal requirements to ensure professional minor children were safe from child abuse, it was forseeable that its failure to implement and train under its own policies caused the damages toward Mr. Dewsnup.

**B. The case cited by USSF and its supporting declarations are irrelevant and admits it is involved in the hiring, training and supervision of RSL coaches and staff.**

The case USSF cites is irrelevant because the plaintiff failed to allege *any* USSF conduct in the forum state. No. 8:24-cv-02775-LKG, slip op. at 11-12 (D. Md. Aug. 20, 2025). The player had no contractual relationship with USSF. The allegations were related to a negligent premises claim against USSF. Here, Mr. Dewsnup has alleged extensive USSF conduct in Utah, including registration requirements, national team participation, Utah-based camps and training, and governance of Utah soccer organizations. *Doe* supports jurisdiction in this case, not dismissal.

In *Anderson v. American Society of Plastic & Reconstructive Surgeons*, the Utah Supreme Court sustained jurisdiction over a national organization that directed injurious activity into Utah. 807 P.2d 825 (Utah 1990)(case involving a claim against an entity for medical malpractice where plaintiff found entity was involved in ensuring FDA compliance). Like the organization in *Anderson*, USSF selected and trained individuals who would operate in Utah, established policies governing their conduct, and maintained supervisory authority over the relevant program. (Compl. ¶¶ 16, 18, 33). USSF's Utah contacts are at least as substantial as those found sufficient in *Anderson*.

The declarations provided by USSF that there is no facility in Utah is completely irrelevant to the Burger King analysis. Additionally, the claim that it does not own, operate or is involved in the hiring firing of employees of MLS is irrelevant. That does not exclude it from its own independent obligation toward protecting minor professionals for child abuse. USSF in its declaration admits that its "nationwide operations" extend to all 50 states. It admits it is involved in coaching licensing and referee training and camps and events. USSF Exb. 1 at ¶ 9. It admits it has 15 active network employees in Utah. Id. at ¶ 7. If USSF has employees in Utah, then it would expect to have a lawsuit arising out of the state of Utah regarding employment claims

from those employees or any actions regarding those parties from third parties. This is especially true if those employees were in charge of the training and policing of child abuse within the state of Utah. It makes zero mention of its duties and requirements toward minor children and professional athletes and protecting them from child abuse but still does not deny them.

What would also be great to know is the amount of money USSF derives from the MLS and RSL with the contractual arrangements they have, including the USSF national teams which would be much different than just a local recreational soccer team and with the relationship already alleged with RSL the business it transacts. What would also be great to know is of those "network employees" were in charge of the governing duties toward professional minor players in protecting them from child abuse and training.

Furthermore, if as the USSF declaration claims USSF is involved in coaching licensing programs, then it does have a say on the hiring, training and supervision of coaches. The claim it does not have a say in the hiring, firing, supervision of membership employees and coaches cannot be true if coaches have to be licensed through them. It can in fact have a say in such things if USSF threatens to pull RSL or the RSL membership as a recognized professional sports team in the United States. Just as Mr. Dewsnup noted in his response to MLS, the CBA is irrelevant. The issue stems from USSF's governing of child abuse among professional soccer organizations and its role it plays among professional soccer organizations which is different than a local recreational league.

**C. USSF was in privity of contract with Mr. Dewsnup as a registered USSF member as well as all other professional players in Utah and member entities, MLS and RSL.**

MLS provided the agreement between Mr. Dewsnup and MLS in its motion to dismiss. (See MLS 12(b)(6) Mot. at Exb. 1).

In the agreement between Mr. Dewsnup and the MLS, it says that the agreement was subject to and conditioned on "you being registered by the United States Soccer Federation or Canadian Soccer Association, as applicable, to MLS." Id. at P. 3(1)(b). It required Mr. Dewsnup to register with the United States Soccer Federation by a certain time or he would not be registered as a player with MLS. Id. at (1).

The agreement further states, "The Player shall be made available upon request by the USSF or his national association for international games … in accordance with FIFA rules." Id. at P. 12 of CBA(11(c)).

The complaint also alleges Mr. Dewsnup was part of the U.S. men's amateur soccer league through USSF and part of the its men's U20 and U17 team. (Compl. ¶ 16). It notes Mr. Dewsnup played for the U.S. national team for U17 and was set to play in the U17 FIFA World Cup in India until COVID hit. Compl. at ¶ 18. Additionally, the complaint alleges that MLS was on the professional counsel for USSF. ¶ 27.

Apart from this and Mr. Dewsnup, the complaint notes the ongoing relationship with USSF and RSL, a professional soccer team and a Utah entity with its involvement with its players and players playing on its national team. USSF would have other contracts and requirements to play on its national team with other Utah professionals just like with Mr. Dewsnup. USSF personally availed itself to the jurisdiction of Utah with its involvement with a Utah professional team through RSL. USSF would have known that a dispute would arise between it and RSL and or one of its players with the continuous and systematic relationship with RSL. USSF has much more involvement and continuous and systematic contacts contractually and purposefully avails itself in states that also have a professional league in it, including Utah. (Compl. ¶ 16, 27, 30, 31, 33 - 40).

Mr. Dewsnup does not have the luxury of creating declarations or questioning individuals from USSF as part of a motion to dismiss on their involvement in child sexual abuse. However, their website further notes requirements for membership. Not just membership of players but of organizations and requirements to keep that membership. Membership requires "a risk management program to promote the safety and protect the welfare of participants." It requires, "adopting policies prohibiting sexual and physical abuse." It notes, "the federation may audit or review an organization to determine compliance." It requires organizations complying with USSF rules and policies. It also notes that USSF's governing documents take precedence over member organizations governing documents and USSF can audit or review members for compliance. It says those seeking membership must comply with USSF's bylaws, policies, requirements, statutes, regulations and directives. (See Pln. Exb. 1)

Also, contrary to USSF's declarations, their own website states that they have state associations which is the administrative body within a territory determined by the national council to curry out the federation's programs for amatuer youth or amateuter players or both. Id. Essentially, it has established a membership structure through which state associations carry out the federation's programs. Id.

USSF was in privity of contract with Mr. Dewsnup and purposefully availed itself when it required Mr. Dewsnup to play for the USSF if he played with USSF. There was an implied contract or even an express contract between him and USSF where he had to play for its national team. Not only that, Mr. Dewsnup *was an actual registered member with USSF.* Given that Mr. Dewsnup was required to register as a USSF member, this further affirms USSF's affirmative regulatory role in the professional soccer system. This also clarifies why his MLS contract contains that language. It was not a mere incidental reference, but USSF itself identifies

professional player registration as part of its federation functions. The claim that there is no personal jurisdiction over USSF where Mr. Dewsnup played as a player for USSF cannot stand. Mr. Dewsnup could not play for MLS if he was not registered with USSF. USSF could call Mr. Dewsnup to the national team up at any time and it did. As alleged in the complaint, USSF called up Mr. Dewsnup to play with and for USSF on their national teams on the U20 and U17 teams. This was not random, fortuitous or attenuated. Mr. Dewsnup could not play professional soccer unless he also agreed to work and play for USSF as part of his agreement. USSF deliberately reached out and had a contractual arrangement with Mr. Dewsnup as a professional soccer player and exploited the market of minor children playing professional soccer. It wasn't just a theoretical provision, it was a provision that was actually exercised and imposed on Mr. Dewsnup during Mr. Dewsnup's professional tenure.

**D. USSF had contacts within the state of Utah with its agreements and relationships with MLS and RSL who were also members of the USSF.**

MLS and RSL as organizations also had to be members of USSF. So if Mr. Dewsnup is suing MLS and RSL, who are members of USSF, then he is and must also sue USSF as a necessary party. It is also alleged MLS is a member of USSF's governing counsel. If MLS and RLS are members of USSF then the relationship of Mr. Dewsnup with the MLS and RSL and all three being members of USSF is sufficient to show that USSF did in fact have a continuous and systematic relationship with Mr. Dewsnup through its members RSL and MLS in addition to the direct membership relationship with Mr. Dewsnup. This is in addition to all the other professional RSL players who also required to be members of USSF.

Also, if MLS and RSL were members and Mr. Dewsnup was a member, and there is no mention of Mr. Dewsnup and payment playing for the international team, there must also be a contractual relationship between MLS and USSF as well membership dues and revenue sharing

in sharing players with the international team in addition to any teams and games RSL plays internationally.

The provision that allowed USSF to call-up Mr. Dewsnup could only be a provision required by the USSF, the national governing body of soccer. Not only that, Mr. Dewsnup was required to register with the United States Soccer Federation. Further demonstrating a specific contractual and unique relationship between Mr. Dewsnup and USSF. It was conditioned so that if he did not register with the USSF, he could not play for MLS.

The unique relationship here created a substantial connection with Mr. Dewsnup and USSF engaged in significant activities with Mr. Dewsnup. He was contractually obligated to work with USSF for four years. USSF, availed itself to conducting business in Utah and with Mr. Dewsnup specifically, in using him to play for its national teams and to Utah's child abuse laws. USSF cannot say it did not exploit the market of Utah when it required Mr. Dewsnup to play for the national teams. It cannot say that it can exploit minor children to work and play as professionals, make money off those minor's name and likeness, ticket sales and advertising revenue for the national teams and somehow not be subject to Utah's child abuse laws and norms and jurisiction for anything that happens to those minor children. USSF, the national governing body, allowed minor children, in this case, a Utah minor, to play professional soccer with adult males, not only that, it made a requirement that those minor children were also subject to playing for it as well as a condition of employment. The claim it did not purposefully avail itself to Utah's jurisdiction is in complete defiance of its role and duty toward Mr. Dewsnup.

USSF does not mention the personal contractual relationship it had with Mr. Dewsnup. Mr. Dewsnup had a continuing obligation with USSF throughout the entirety of his MLS

contract. As a result, it is not unreasonable to require USSF to submit to burdens of litigation regarding Mr. Dewsnup and his time as professional player as an adult.

If MLS was part of the governing body for USSF and part of the decision-making for USSF, then USSF cannot claim that it is not involved in the contacts with professional players, MLS and USSF would essentially be one and the same.

Thus, USSF was not merely an uninvolved national organization that happened to exercise abstract regulatory authority over the sport in which Mr. Dewsnup participated. Mr. Dewsnup's ability to play professionally for MLS was expressly conditioned upon registration with USSF, and the Agreement expressly recognized USSF's authority to require Mr. Dewsnup's availability for international competition.

Furthermore, if MLS was part of one of USSF governing counsel's then it would be hard to claim that it a relationship far attenuated from the relationship Mr. Dewsnup had with MLS.

**E. USSF had the obligation to protect minor professional athletes from child abuse and had the charge of training professional players and coaches and implementing child abuse policies among professional organizations.**

Mr. Dewsnup's claims against USSF concern USSF's alleged failure to fulfill obligations arising from its role as the national governing body for soccer, including its alleged duties relating to athlete safety, the protection of minor athletes, the promulgation and implementation of safety policies, training, oversight, and reporting. The Complaint specifically alleges that USSF was responsible for establishing policies and procedures intended to protect minor athletes from physical, emotional, and sexual abuse, including policies governing one-on-one interactions between minors and adults, training requirements, and mandatory reporting obligations. (Compl. ¶¶ 27, 33).

It alleges USSF is involved in coaching licenses, referee development, coaching and education courses. That would include the coaches for RSL in Utah and coaches that coach in Utah. It alleges that is in charge of not just implementing policies, but sanctioning. Id. It alleges that USSF had the specific obligation to ensure that that minor professional athletes working in a professional organization were not subject to physical, emotional and sexual child abuse. Id. at ¶ 27. It alleges that USSF had the federal statutory duty to protect minor professionals from physical and sexual abuse under the Safe Sport Authorization Act. Id.

Those alleged duties directly relate to the activities USSF allegedly conducts in Utah. USSF allegedly regulates and sanctions soccer activities in Utah, evaluates and train players, conducts or participates in training camps and events, and provides coaching, referee, and educational programs within the State. (Compl. ¶ 16, 19). This is not a case in which the Complaint identifies unrelated contacts with Utah and attempts to use those contacts to establish jurisdiction over an entirely separate dispute. Rather, the contacts alleged involve the same general activities from which USSF's alleged duties arise: the governance, regulation, development, training, and protection of soccer players, including minor athletes.

USSF's contacts with Utah should not be artificially separated from its relationship with Mr. Dewsnup. The Complaint alleges that USSF deliberately conducts governance, training, regulatory, safety, and development activities within Utah. At the same time, Mr. Dewsnup's MLS employment was expressly conditioned upon his registration with USSF, and USSF possessed the right to request his availability for international competition. Mr. Dewsnup thereafter actually participated in USSF's national-team programs.

Taken together, these allegations establish substantially more than an isolated relationship between an out-of-state organization and a Utah resident. They allege a continuing and deliberate

relationship involving Mr. Dewsnup's professional soccer career, his participation in USSF national-team programs, USSF's contractual rights concerning his availability for international competition, and USSF's affirmative activities governing and regulating soccer and athlete safety in Utah.

USSF attempts to characterize its relationship with Mr. Dewsnup as though he were simply another participant in a local recreational soccer program over which USSF exercised only remote authority in a state with no professional sports team or players that don't play on the national team. The allegations and the contractual documents incorporated into the litigation demonstrate otherwise. Mr. Dewsnup was a professional player whose ability to participate in MLS was expressly conditioned upon registration with USSF. He was required to be available to USSF for international competition and actually played within USSF's national-team system.

As noted in the complaint, the situation could all have been avoided if there were policies, training and implementation of those policies where Mr. Dewsnup was not required to be in an adult lockerroom and shower with professional male adults, if Mr. Dewsnup was not subject to one-on-one conversations and had a personal care assistant. USSF was tasked with that training and enforcement as the national governing body for professional minor athletes. USSF was tasked with ensuring all the coaches and staff knew what child abuse was, the dos and don'ts of dealing with a minor child, how to report child abuse and investigating child abuse.

Mr. Dewsnup and his parents were at the mercy of USSF and its duties and role to ensure his protection as a minor professional athlete and ensure his coaches knew how to deal with the youngest signing RSL had ever made. USSF didn't do what it was supposed to do. For USSF to claim that it now somehow isn't subject to Utah's laws and jurisdiction when it was tasked with protecting Mr. Dewsnup undermines and defies the principles and purpose of Burger King. The

only way USSF could factually get out of this situation is if it was that national governing body minus Utah.

The contractual provisions are also relevant because they demonstrate that USSF's relationship with Mr. Dewsnup was not merely the result of his unilateral activity. See *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014). The Agreement expressly incorporated USSF's authority and regulatory role into the conditions governing Mr. Dewsnup's professional employment. USSF therefore cannot plausibly characterize its relationship with Mr. Dewsnup as an accidental or isolated consequence of his independent activities in Utah.

As a result, there is jurisdiction not only with the independent requirements USSF had as the NGB toward child abuse and minor children, but also with the specific contractural relationship it had with Mr. Dewsnup as a registered member, with the MLS And RLS and the other professional USSF member players within the state of Utah that it personally availed itself within the state of Utah and would expect for a lawsuit to arise out of those relationships.

**II. USSF owed a duty to Mr. Dewsnup as the trainer, implementer and enforcer of policies related to child abuse among professional organizations who were also members of the USSF, professional athletes who were members of the USSF and as to Mr. Dewsnup also a member of the USSF player of its national national soccer team, it has a special relationship with Mr. Dewsnup as a minor and took on the duty of policing child abuse.**

**A. Duties USSF owes to minor professional sports athletes as the national governing body of the sport and history of child abuse with NGBs.**

Federal law specifically states, as to the general duties of national governing sports bodies, (NGBs) is to "promote a safe environment in sports that is free from abuse of any amateur athlete, including emotional, physical, and sexual abuse." "immediately report to law enforcement any allegation of child abuse of an amateur athlete who is a minor; and" "have in place policies and procedures to report immediately any allegation of child abuse of an amateur

athlete, consistent with- (A) the policies and procedures developed under subparagraph (C) of section 220541(a)(1); and (B) the requirement described in paragraph (2)(A) of section 220542(a)." (See 36 U.S.C. § 220524(b).

The same statute goes on to state, "nothing in this section shall be construed to preempt or otherwise obrogate the duty of care of a national governing body under state law or the common law." Id. at (b).

In *Navarro v. United States Center for SafeSport,* 25-1150 (4th Cir. 2026) the 4th circuit laid down the purpose and intent of Amateur Sports laws. It noted that for forty years NGBs governed themselves, but a growing series of abuse scandals within the Olympic sports made the arrangement unsustainable. It noted that the USOC developed a plan to centralize and standardize abuse investigations involving NGB members. It further noted that the USOC convened a working group of governing bodies to draft code to govern all allegations of emotional, physical and sexual abuse within Olympic sports. It noted that the Safe Sport Authorization Act makes compliance with the SafeSport Code a condition of eligibility for any private organization to serve as an NGB. Id. at (I)(A).

It noted that private organizations were allowed to serve as NGBs, provided that they complied with certain statutory criteria. Id. The U.S. Center for SafeSport, which is the federal agency that governs USSF, as it pertains to child abuse, can ban individuals and its members from participation in any events if there is past conduct related to child abuse. Id.

### B. Duties owed under Utah law and the special duty as the NGB to police and train child abuse among professional organizations and with its members and those it is in contract.

The Utah Supreme Court has defined negligence "as a failure to exercise the degree of care which a reasonable person would have exercised under the same circumstances, whether by

acting or by failing to act. In cases where the alleged negligence consists of a failure to act, the person injured by another's inaction must demonstrate the existence of some special relationship between the parties creating a duty on the part of the latter to exercise such due care in behalf of the former." *DCR INC. v. Peak Alarm Co.* 663 P.2d 433 (1983).

"Relationships giving rise to such a duty include those between carriers and passengers, employers and employees, owners and invitees and parents and children." Id. at 435. "Similarly, contractual relationships for the performance of services impose on each of the contracting parties a general duty of due care toward the other, apart from the specific obligations expressed in the contract itself. The care to be exercised in any particular case depends upon the circumstances of that case and on the extent of foreseeable danger involved and must be determined as a question of fact." Id. A party who breaches his duty of due care toward another may be found liable to the other in tort, even where the relationship giving rise to such a duty originates in a contract between the parties. Id.

In *Young* the Utah Supreme Court court noted, "when a school district has custody of a child, it acts as a substitute for the student's parent or guardian." and therefore assumes a "custodial duty of protection." By taking custody of the child, the district has "deprived the child of the protection from his parents or guardian." "Therefore it is properly required to give him the protection which he has lost." Id. at ¶14 ."[t]he essence of a special relationship is dependence by one party upon the other." *Id. Young, v. Salt Lake City School District,* 2002 UT 64 (Utah 2002).

Under Utah Code Section 76-5-404.1, it notes that as to sexual abuse of a child, a "position of special trust" includes an athletic manager, a coach, an employer, a recreational leader who is an adult, an instructor, a youth leader, or any individual in a position of authority, which enables the individual to exercise undue influence over a child. (See also *DCR, Inc. v.*

*Peak Alarm Co.*, 663 P.2d 433, 435 (Utah 1983)(noting special relationships with employers and employees). Elementary and high schools are characterized as a mixture of custodial and educational institutions. *Beach v. University of Utah*, 726 P.2d 413, 415 (Utah 1986).

In *Mayall v. USA Water Polo, Inc.,* 909 F.3d 1055 (9th Cir. 2018) the 9th circuit found that USA Water Polo took on a voluntary undertaking claim because the organization had undertaken responsibilities to athlete safety. The state of Utah recognizes this type of undertaking when it reaffirmed the restatement of torts that cites such an undertaking and noted, "one who undertakes to render services to another that are necessary for the protection of that person's safety may be liable for physical harm wrestling from a failure to exercise reasonable care where the failure increases the risk of harm or the person relied upon the undertaking." *MacGregor v. Walker,* 2014 UT 2, ¶ 13.

The 4th circuit lays down the history and seriousness of child abuse among professional sports organizations and the abuse caused not only by professional organizations, but the NGBs. It also notes the heightened scrutiny and duty USSF has as the current NGB of soccer. USSF attempts to somehow downplay and undermine its role as the NGB of soccer and policing child abuse among minor professional athletes. If USSF fails at policing child abuse among its professional organizations and professional players and others members it can no longer be eligible as an NGB. It has a duty to investigate, protect, deter and enforce or face losing its NGB status. That is why this is not a CBA issue, or just a RSL and MLS issue this also includes a very serious NGB issue who was tasked with the policing and safeguarding of child abuse.

While USSF may argue the Safe Sport Act does not create a private right of action, the statue itself specifically says otherwise and instead-green lights what this action is, an action under state common law. The Act further establishes the standard of conduct and the duty of care

owed to minor professional athletes as does the 4th circuit. The history of NGBs and their involvement is child abuse scandals and their duties to keep licensure and its duties to police and govern child abuse as an NGB shows why USSF is a necessary party to this action and how this isn't something that just involves a professional organization but also the NGB of the sport.

MLS in its motion attempted to claim that regulation of child abuse among professional athletes was governed by the CBA. As noted in Mr. Dewsnup's opposition brief that is incorrect. As alleged in the complaint, and noted by the 4th circuit, the source of the training, the policies and policing come from the USSF, a separate entity. USSF is a necessary party to this action. USSF as the national governing body had the task to ensure minor professional athletes were safe from child abuse.

This is not just specific to any child abuse, with any local recreational league. This is specific to professional athletes playing with adult male professional athletes and who are contracted with the USSF national team. Professional athletes who are mandatory members of the USSF per the contract of Mr. Dewsnup with MLS. Professional organizations who are also members of the USSF and part of the governing body and decision-making of USSF. It is alleged that USSF governed, established and promulgated athlete safety standards, oversight requirements and is in charge of issuing sanctioning to any violations of those policies. (Compl at ¶ 16).

This in addition shows and the complaint alleges USSF, took on the responsibility of athlete safety as to child abuse for the necessary protection from Mr. Dewsnup on child abuse in a professional organization and it properly alleges that its failure increased the risk of harm to Mr. Dewsnup. Id.

1. **USSF had a duty to ensure Mr. Dewsnup a required registered member of USSF and contracted player with USSF was not subject to child abuse.**

Furthermore, it is alleged Mr. Dewsnup played for USSF on its national team. It had a contractual duty between Mr. Dewsnup, one if its national players, who is coached as part of the national team through his RSL coaches, to ensure he was free from child abuse. If Mr. Dewsnup was a mandatory member to USSF, then USSF owed a duty to ensure Mr. Dewsnup was free from child abuse among its other members, including player members and organizations, which is alleged that MLS was a member of the USSF. If other professional players are mandatory members of the USSF as required in Mr. Dewsnup's contract, they had a duty to ensure other professional players and USSF members were not committing child abuse. If USSF could contractually call up Mr. Dewsnup up at anytime to the national team as a USSF member, which it did, it had a duty to ensure Mr. Dewsnup was free from child abuse as a professional player and USSF member. USSF benefitted from the contractual relationship by exploiting Mr. Dewsnup's name, image talent and ticket and advertising revenue. USSF cannot take the benefits of Mr. Dewsnup's professional career while disclaiming the duties that came with protecting a minor athlete.

USSF repeatedly argues that its national governing body status cannot substitute for conduct. But the complaint alleges conduct against USSF, not just status, which includes the failure to act. USSF mandated safety policies, tasked with training and implementation of policies. That is conduct. It is alleged that USSF is involved in the coaching licensing. It is alleged that USSF was tasked with coaching education courses. Id. It is alleged that club directors need USSF credentials. Id. at ¶ 17. It is alleged USSF owed a duty to Mr. Dewsnp to protect him for child abuse by adult players and coaches. Id. at ¶ 27. It is alleged MLS owed the duty to ensure that organizations had protections enacted when employing minor children. Id. at ¶ 28. It alleges USSF owed a duty as to the supervision, transportation, housing training and

overseeing his medical injuries. It alleges USSF had the duty to establish policies, procedures to protect amateur athletes from physical and sexual abuse. Id. at ¶ 33. This included limiting one-on-one interactions between minors and adults and mandatory reporting to the U.S. Center for SafeSport.

**2. USSF as the NGB and the contractual relationship with MLS and RSL was the main entity in charge of implementing, training and policing of professional organizations, its players, coaches and staff regarding child abuse with minor professional players.**

Essentially, USSF was the Human Resources and or federally mandated entity as it pertained to child abuse as to minor professional athletes with MLS and RSL and tasked by the U.S. Center for Safe Sport. Id. USSF is essentially saying the training and regulation and governance was on MLS and RSL which is not alleged in the complaint nor is it reality as noted by the 4th circuit.

If USSF is like the human resources of child abuse, then MLS and RSL its personnel and players are like the employees and also USSF members. It had a duty to policy child abuse among its members. USSF was the contractor to create a safe environment for professional minor athletes. They didn't create any "safety or guardrails" for Mr. Dewsnup as to child abuse as they were required to do. If USSF doesn't train and implement policies and investigate child abuse and have methods of reporting child abuse that is a problem not just for MLS and RSL but also USSF. It owed a duty owed to young professional athletes to do so from its own policies and from federal mandates and state law. They were tasked to ensure organizations were following state and federal law. It is alleged USSF took on the mantle of overseeing child abuse among professional organizations.

The task was specific to USSF, they were in control of what policies would and should be implemented for minor professional athletes. They were in control of training to coaches, staff

and adult professional players as to child abuse. They were in control of the policies and how they would be implemented and how to deter child abuse among professional organizations. MLS and RLS could not and did not self-regulate or self-govern child abuse because USSF took that away, they were dependent on USSF to train, license and properly implement polices.

The training came from USSF. The policies came from USSF. The sanctions came from USSF. The claim that is not alleged there was no supervision or control is unfounded. If a coach doesn't get a license from USSF they can't coach. If an adult professional player violates USSF's child abuse policies their membership could be revoked. That's control, that's supervision. If MLS sits on the professional counsel and violates child abuse policies, their membership could be revoked.

If a coach, a manager and an organization doesn't know how to properly interact with a minor child that is on USSF for its failure to train, supervise and implement policies to retain its NGB status. It had that affirmative duty. Mr. Dewsnup would like to know why USSF decided not to train his goalkeeper coach, his head coach, his general manager and the other professional adult male players on child abuse and ensure they implemented policies to protect him when they signed the youngest player ever to their roster?

Mr. Dewsnup would like to know why USSF didn't step in and didn't have reporting procedures when he and his parents first reported child abuse to his coach and general manager. If this affected their NGB status, why didn't they do anything?

Furthermore, USSF could not claim they owed any duty to Mr. Dewsnup after he who a member of USSF, reported child abuse to his coaches and general manager. Once Mr. Dewsnup and his parents made a USSF member organization aware of the abuse, USSF had a duty to

investigate, report and stop the abuse and protect Mr. Dewsnup and train and deter and future abuse. It didn't.

Mr. Dewsnup would like to know how he was required to register as a USSF member as a minor professional athlete putting USSF on notice of his age and professional title, but somehow when he walked through the doors there were no protections for him that USSF and federal law and guidelines claimed should exist and needed to exist to keep its NGB status.

**3. USSF had a special relationship with Mr. Dewsnup.**

USSF argues there was no special relationship because it lacked daily custodial control. It had control of its members which included other male adult players, coaches and staff. The "special relationship" doctrine does not require 24/7 physical custody, it requires control and heightened degree of vulnerability. Mr. Dewsnup was a minor child placed in a professional environment with adult males because USSF permitted it.

USSF could have easily banned minor professional athletes. That would have been the easy fix. They instead allowed it, welcomed it and exploited it without taking on the additional duty to protect them. To claim they owed no duty to the minor athletes that it required to be part of its national team which it benefitted from and allowed to play with male adult players is illogical and defies federal law and state common law norms.

Mr. Dewsnup and his parents were entirely at the mercy of USSF for its decision to allow minor children to play in professional organizations and its governance or lack thereof regarding the protection of those minor children.

His parents could not direct and train staff, coaches and players and would not know how to train staff and players on how to deal with minor children. USSF had the ultimate authority to mandate safety protocols, remove bad actors and require chaperones. It didn't.

Did USSF deprive Mr. Dewsnup's parents from their protection? Yes. They took on the mantle of child abuse training and policies and so were required to give Mr. Dewsnup the protection he had lost. This includes the protection and training when a minor child tells his coach he is still dealing with an injury and his coach forces him to play while injured anyway. This includes protection when a coach or player is verbally and emotionally abusing a minor professional player. This includes protection of a minor child as to the showering and changing of minor children among other professional adult players. It had a duty and ability to, train and control professional organizations, its players and staff and with policies when dealing with minor children. It didn't.

**CONCLUSION**

USSF has personally availed itself to the state of Utah with its contractual relationship with Mr. Dewsnup, the MLS, the RLS and other professional sports players in Utah. It also owed a duty to Mr. Dewsnup with that relationship as the NGB of soccer to implement, police, train and enforce violations of child abuse among professional organizations that were members of USSF, it coaches and players. For these reasons, its motion to dismiss should be denied.

Respectfully submitted this 31st day of August, 2026.

/s/ Brian K. Jackson #15296
Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Mr. Dewsnup

**Certificate of Service**

I certify under penalties of perjury subject to the Utah State Code that I mailed a true and correct copy of the Opposition to Defendant's 12(b)(6) Motion to Dismiss via electronic filing and e-mail with the CMF e-filing system which sent notice to all Defendants who have made an appearance on this matter on August 31st, 2026.

/s/ Brian Jackson______
Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Plaintiff